**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JENNIFER BARKLEY,

                                        Plaintiff,

          v.                                                    No. 06-CV-730
                                                                    (DNH/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____

**APPEARANCES:**                              **OF COUNSEL:**

CONBOY, McKAY, BACHMAN &                LAWRENCE D. HASSELER, ESQ.
     KENDALL, LLP
Attorney for Plaintiff
307 State Street
Carthage, New York 13619

HON. GLENN T. SUDDABY                    GINA SHIN, ESQ.
United States Attorney for the Northern    Special Assistant U.S. Attorney
    District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**


**REPORT-RECOMMENDATION AND ORDER**[1]

          Plaintiff Jennifer Barkley ("Barkley") brought this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

Barkley moves for a finding of disability and the Commissioner cross-moves for a

_____

          [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings.  Docket Nos. 6, 10.  For the reasons which follow, it is

recommended that the Commissioner's decision be affirmed in part and remanded in part.


## I. Procedural History

On November 30, 2004, Barkley filed an application for disability insurance benefits

pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 49-51.[2]  That application

was denied on February 23, 2005.  T. 25-28.  Barkley requested a hearing before an

administrative law judge ("ALJ"), which was held before ALJ J. Michael Brounoff on

November 18, 2005.  T. 187-218.  In a decision dated January 23, 2006,  the ALJ held that

Barkley was not entitled to disability benefits.  T. 14-20.  On February 13, 2006, Barkley

filed a request for review with the Appeals Council.  T. 7-8.  The Appeals Council denied

Barkley's request for review on April 20, 2006, thus making the ALJ's findings the final

decision of the Commissioner.  T. 4-6.  This action followed.


## II. Contentions

Barkley contends that the ALJ erred when he failed to (a) credit properly the opinion

of Barkley's treating physician, (b) credit properly her subjective complaints of pain, (c)

determine correctly her residual functional capacity ("RFC"), and (d) support his conclusion

that Barkley could perform other work that exists in the national economy.  The

Commissioner contends that there was substantial evidence to support the determination

---

[2] "T." followed by a number refers to the pages of the administrative transcript
filed by the Commissioner.  Docket No. 3.

that Barkley was not disabled.

## III. Facts

Barkley is currently twenty-six years old and has a high school equivalency degree with training in cosmetology.  T. 49, 58, 192.  Barkley's recent employment history includes positions as an assistant at an adult home, babysitter, cook and cashier at a fast food restaurant, and nurse's aide at a nursing home.  T. 54.   Barkley contends that she was disabled on January 5, 2002 and unable to work as of October 27, 2003 from back injuries which were further exacerbated by her obesity.  T. 15, 54.

## IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical

3

facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. -4 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

4

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## V.  Discussion

## A. Medical Evidence

Barkley alleges that she became disabled due to a back injury which occurred on January 5, 2002 when she slipped while transferring a patient in a nursing home.  T. 128. Barkley went to the Massena Memorial Hospital ("Memorial") Emergency Room after the

5

fall.  T. 82-90.  Barkley complained of sharp pain radiating down her leg.  T. 83.  Barkley

was ambulatory when she arrived, was diagnosed with an acute lumber contusion and

strain, and was discharged with a prescription and instructions to return if the pain

continued.  T. 83, 84.  Barkley also underwent an MRI of her lumbar spine which was

negative, "show[ing] normal alignment" overall.  T. 87.  During Barkley's follow-up

appointment with Dr. Sullivan, she was instructed to rest, take Tylenol for pain, and stay

home from work for a few days.  T. 90.

On August 11, 2003, Barkley returned to Memorial complaining of lower back pain

which increased with any movement.  T. 91-92.  She was again ambulatory, diagnosed

with a lumbar strain, and discharged home.  T. 92, 93, 96.  Barkley was instructed only to

follow-up if her symptoms failed to improve within a week.  T. 98.  On August 28, 2003,

Barkley again returned to Memorial complaining of hip and back pain.  T. 100.  Barkley

was ambulatory and was diagnosed with acute right lumbar strain with indications of

sciatica[3] on the right side.  T. 102, 104.  The medical staff ruled out herniated disks as the

cause of Barkley's pain.  T. 102.  Barkley was instructed to rest and follow-up with her

primary care physician.  T. 106.  She was also given prescription pain medication.  Id.

The next day, Barkley returned to Memorial complaining of continued back and hip

pain and left leg numbness.  T. 108.  Barkley was ambulatory but reported that her

situation had worsened compared to the day before.  Id.  Barkley was diagnosed with

acute sciatica, discharged home due to her improvement and stability, instructed to follow-

---

[3] Sciatica is "a syndrome characterized by pain radiating from the back . . . into the
lower extremity . . . most commonly caused by protrusion of a low lumbar . . . disk."
DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1493 (28th ed. 1994) [hereinafter
"DORLAND'S"].

up with Dr. Lewis, prescribed a muscle relaxant, directed to take over-the-counter medication for pain, and scheduled for another MRI.  T. 112, 114.

On or about October 27, 2003, Barkley was treated for the first time by a chiropractor, Dr. Klein.  T. 115.  Barkley's treatment consisted of spinal manipulations.  T. 116.  Dr. Klein assessed Barkley's functional limitations as being able to lift five pounds frequently, lift ten pounds occasionally, and, at a maximum, lift fifteen pounds.  T. 119. Additionally, Dr. Klin found that she was limited to standing and walking less than two hours a day, sitting less than six hours a day, and was prohibited from pushing or pulling. T. 120.  Barkley was also x-rayed the same day at Canton-Potsdam Hospital.  T. 124.  The x-ray was normal.  Id.

On January 15, 2004, Barkley was seen by Dr. Edward Sugarman for a consultation.  T. 128.  Dr. Sugarman noted that the chiropractic manipulations Barkley was receiving seemed to help, although she was still limping and suffering back pain of varying intensity.  Id.  Additionally, Dr. Sugarman noted that one of Barkley's legs was longer than the other, she had undergone x-rays which were essentially negative, and she had been using a walker at home since August 29, 2003.  Id.  Dr. Sugarman diagnosed Barkley with "a low back strain with possible radiculopathy."[4]  T. 129.  He also stated that Barkley suffered from a "marked disability"; however, he needed clarification as to the cause of the disability via an MRI.  Id.  Dr. Sugarman also indicated that Barkley's weight was an aggravating factor for her back pain.  Id.

On March 17, 2004, Barkley underwent another consultation with a chiropractor, Dr.

_____

[4] Radiculopathy is a "disease of the nerve roots" caused by "compression . . . due to . . . spondylosis . . . ."  DORLAND'S 1405.

7

Neil Zirn.  T. 130.  Dr. Zirn indicated that Barkley had been undergoing physical therapy and chiropractic manipulations which had slightly improved her condition because, although she was still experiencing back pain, it was less frequent and the numbness in her left leg had lessened.  Id.  Barkley disclosed that she ended her employment as a nurse's aide due to unacceptable work hours and presently was "seeking to work and able to work even though she . . . experience[s] low back pain and leg discomfort."  Id.  Dr. Zirn diagnosed Barkley with lumbosacral sprain with radiculitis[5] and concluded that she had a fair prognosis, the chiropractic treatment should continue, and her disability determinations should be deferred pending MRI results.  T. 131.

On May 17, 2004, Barkley underwent an MRI of her lumbosacral spine.  T. 125, 144.  The results showed small-to-moderate disc herniations at T10-11, L3-4, and L4-5. Id.  Dr. Zirn conducted another medical examination on August 18, 2004.  T. 132-35.  Dr. Zirn indicated that since Barkley's last evaluation, she had "slight improvement in her low back pain . . . [and] that some feeling has been coming back into her left leg . . . ."  T. 133. Her occupational history was identical to that provided at the last consult.  Id.  Dr. Zirn concluded that Barkley had intervertebral disc syndrome with radiculitis, a fair prognosis, and "a moderate, partial disability at this time."  T. 134-35.  Additionally, he recommended continued chiropractic treatment and that Barkley not return to her previous employment as she had exertional limitations preventing her from lifting more than ten pounds and repeatedly bending and twisting.  T. 135.

On September 24, 2004, Barkley underwent an MRI of her thoracic spine.  T. 126,

---

[5] Radiculitis is an "inflammation of the root of a spinal nerve . . . ."  DORLAND'S 1404.

8

145.  The MRI showed that Barkley was suffering from degenerative disc disease and small disc protrusions at the T8-9 and T10-11 sites.  Id.  Barkley underwent another thoracic MRI on October 26, 2004.  This MRI confirmed the prior findings of "[e]arly degenerative disc changes at T8-9 . . . , [although there were n]o significant degenerative changes at T10-11 . . . ."  T. 127.

On February 3, 2005, Barkley had another consultative examination with Dr. Shara Peets.  T. 136-37.  Dr. Peets noted that Barkley no longer used a cane, performed housework but could not do chores requiring repetitive lifting or bending, had difficulty vacuuming and mopping, and climbed on and off the examination table without assistance.  T. 136.  Additionally, Dr. Peets noted that Barkley's "gait, heel and toe standing [were] normal," and her cervical, thoracic, and lumbar spine retained normal ranges of motion.  Id.  Dr. Peets concluded that Barkley had chronic lumbar pain, thoracic and lumbar herniated discs, and left leg numbness which was non-radicular in distribution.  T. 137.  Additionally, Dr. Peets assessed Barkley's physical limitations as not being able to lift and carry more than ten pounds and stand, walk, or sit as noted.  Id.  Finally, Dr. Peets stated that Barkley's prognosis was poor-to-guarded in light of her longstanding limiting symptoms, although they had demonstrated improvement over time.  Id.

On February 15, 2005, Barkley underwent a physical RFC assessment by N. Siciliono.  T. 138-43.  The assessment noted that Barkley's gait and heel-and-toe standings were normal, her spine had a normal range of motion despite lumbar disc herniations, thoracic disc protrusions and early degenerative disc changes, and her weight was an aggravating factor to her injuries.  T. 139.  The analyst concluded that Barkley could occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk at

9

least two hours in a workday, sit about six hours in a workday so long as she had the ability to alternate between sitting and standing to relieve pain, and was not limited at all in her ability to push and pull.  Id.  Barkley's sitting and standing limitations could "be accommodated with normal work breaks . . . ."  Id.  Additionally, while Barkley had restrictive postural limitations, she had no communicative or environmental limitations.  T. 140-41.  Barkley's statements that she could not lift more than ten pounds were found credible while her statements detailing her inability to walk for more than ten to fifteen minutes were not.  T. 141.  N. Siciliono pointed to previous medical conclusions which supported his or her conclusions as (1) Dr. Peets' finding consistent lifting limitations although the rest of the RFC determinations were non-specific; (2) Dr. Sugarman's inappropriate determination of the level of Barkley's disability, a question reserved to the Commissioner; (3) Dr. Zirn's finding that Barkley had a moderate, partial disability which was inappropriate given his occupation as a chiropractor; and (4) Dr. Klein's assessments which were also improper given his occupation as a chiropractor.  T. 142.

From March 2005 to July 2005, Barkley saw her treating physician, Dr. Chicetti.  T. 161-70.  On July 13, 2001, Dr. Chicetti completed an assessment of Barkley's ability to do work-related activities.  T. 169-72.  Dr. Chicetti concluded that Barkley's exertional limitations included occasionally and frequently lifting less than ten pounds, standing or walking at least two hours per day with the ability to alternate between the two to relieve pain and discomfort, and preclusion from pushing, pulling, climbing, balancing, crawling or stooping.  T. 169-70.  Additionally, he determined that Barkley could only occasionally kneel and crouch.  T. 170.

Barkley was given another MRI on October 18, 2005 of her lumbosacral spine.  T.

182-83.  The MRI showed mild-to-moderate spinal stenosis[6] and further disc extrusion at L3-4 as compared to the prior test results as well as increased disc extrusion at L4-5 and no significant change to T10-11.  T. 182-83.

During the administrative hearing, Barkley testified that she was able to attend to her personal hygiene, could assist with meal preparation, house cleaning and dishes, drove a car, occasionally. went shopping, and had a bedroom on the second-floor of the house.  T. 193, 211.  Barkley stated that during an average day, she spent approximately eight to nine hours lying down, seven to eight hours sitting, and four to five hours standing. T. 212-13.  Barkley was still seeing the chiropractor two times a week, but no longer attended physical therapy since it was of no appreciable help.  T. 216.  She took Tylenol to relieve her pain and had not taken prescription pain medication since 2004.  T. 205.  At times, Barkley reclined and elevated her feet in an attempt to alleviate her back pain.  T. 209.  Barkley also confirmed that she left her job as a nurse's aide because she did not like the working environment and indicated that she would continue to babysit her cousin's school-age children, as she did from approximately February through May, if her cousin needed her.   T. 214.  Barkley also stated that transferring patients caused her back to ache and that she would need to rest at work, which was also a factor in her decision to discontinue working.  Id.

## B. Treating Physician's Rule

Barkley contends that the ALJ erred when he failed to give greater weight to the

---

[6] Stenosis is the "narrowing or stricture of a duct or canal."  DORLAND'S 1576.

opinion of her treating physician, Dr. Chicetti.  The Commissioner contends that the ALJ's decision is properly supported by substantial evidence in the medical record and that Dr. Chicetti's opinion should not be given controlling weight because Dr. Chicetti only examined Barkley's back once and his conclusions were not supported by objective evidence in the record.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2003); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner.

Id. at 133-34; see 20 C.F.R. §§ 404.1527(e), 416.927(e) (2003).

Dr. Chicetti opined that Barkley could not lift or carry more than ten pounds or stand or walk for more than two hours, must alternate between sitting and standing to alleviate pain, was occasionally permitted to kneel and crouch, and was prohibited from climbing, balancing, crawling, and stooping.  Barkley contends that this opinion should have been granted controlling weight because it was supported by objective medical evidence and the conclusions of Drs. Klein, Sugarman, and Peets.  However, because Dr. Chicetti only examined Barkley's back once, for the express purpose of completing the medical assessment form, the ALJ accorded the opinion little weight.  T. 17.  Instead, the ALJ relied on the opinions of a consultative physician, Dr. Peets, and the disability analyst who conducted Barkley's RFC evaluation.  Id.

First, there are multiple exertional limitations for Barkley that are uncontested.  It is undisputed that Barkley was subject to an exertional limitation for carrying.  T. 18, 169, 119, 141.  It also appears that there is no contention surrounding Barkley's limited ability to walk and stand in the course of a day, occasionally kneel and crouch, and never climb.  T. 18, 169-70, 120, 140.  There was disagreement over Barkley's ability to crawl, balance, and stoop, although it was unanimous that her abilities were diminished to all non-exertional limitations.  T. 140, 170.  Thus, the only remaining points of contention are Dr. Chicetti's assessment that Barkley was unable to climb, crawl, or stoop.  T. 170.  Additionally, as explained infra, the record is devoid of indications from either Dr. Chicetti or Dr. Peets as to Barkley's sitting limitations during the day or the frequency and duration for which she had to alternate between sitting and standing.

However, the ALJ's determination to accord Dr. Chicetti's opinion concerning

13

Barkley's non-exertional limitations little weight was consistent with other substantial evidence in the record.  With the exception of Barkley's last MRI, all previous radiology reports had been relatively benign showing either normal results or mild disc herniations and protrusions resulting from degenerative disc disease.  T. 125, 144, 126, 145.  The last MRI showed mild-to-moderate stenosis and some progression in the severity of the disc extrusions, but the worsening of Barkley's condition does not automatically render it disabling.  T. 182-83.  Additionally, the appointments of Barkley's doctor noted her improvements with pain and numbness due to her continued chiropractic treatments.  T. 129, 130, 133.  Barkley's appointment with Dr. Peets also demonstrated that, despite her complaints otherwise, Barkley's gait and range of motion in her spine were normal, she no longer needed assistive devices to ambulate, and she mounted and dismounted the examination table without assistance.  T. 136.

Barkley points to the opinions of her other treating physicians as medical evidence bolstering Dr. Chicetti's conclusions.  Barkley contends that her RFC determination should be controlled by (1) Dr. Klein's initial evaluation stating that she is unable to sit for six hours, (2) her subjective complaints to Dr. Peets that she cannot sit for more than sixty-minute increments or stand for more than twenty-minute increments, and (3) the conclusions of Drs. Sugarman and Zirn that she was suffering from partial-to-marked levels of disability.  Reliance on these assessments are insufficient for a variety of reasons.

First, Barkley's assertions that she is unable to sit for six hours is directly contradicted by her testimony that she sat between six and seven hours a day and stood and walked between four and five hours a day.  T. 212-13.  Second, despite Barkley's

14

argument to the contrary, the ALJ was not obligated to give the opinions of Drs. Sugarman

and Zirn[7] opinion controlling weight as the decision whether a claimant is disabled is

reserved for the Commissioner.  Snell, 177 F.3d at 134; 20 C.F.R. § 404.1527(e).  Third,

although Dr. Sugarman indicated that Barkley was suffering from a "marked disability," the

rest of the findings from the examination were benign and Dr. Sugarman ultimately

reserved judgment as to what caused the disability until receiving the MRI results.  T. 128-

29.  This was similar to Dr. Zirn's assessment, which indicated that although Barkley had a

"moderate, partial disability," she had a fair prognosis and was seeking work since she

terminated her employment with her previous employer due to an unacceptable work

environment.  T. 133-35.  This was the second time that Dr. Zirn had categorized Barkley's

prognosis as fair, as well as commenting on the improvements Barkley reported feeling in

the degree of pain and numbness she was experiencing.  T. 130, 133.

       The ALJ also correctly afforded Dr. Chicetti's opinion little weight as compared to

the weight accorded that of the other consultative physician.  T. 17.  First, although Barkley

had been treating with Dr. Chicetti for five months, he only examined her back once for the

express purpose of completing her disability application paperwork.  T. 205-07.

Additionally, as discussed above, Dr. Chicetti's opinion is not consistent with the record as

a whole which indicates that Barkley's condition had been steadily improving, she could sit

and stand for multiple hours per day, and she was actively seeking employment.

Moreover, Dr. Chicetti's status as a primary care physician, as opposed to a specialist,

---

[7] While a chiropractor does not qualify as controlling, his or her opinion may be
used to show "how [the impairment affects your ability to work . . . ."  20 C.F.R. § 416.913
(d)(1).

accords his opinion less weight in light of the other factors previously discussed.

Barkley asserts that the opinions of Dr. Peets and the disability analyst cannot constitute substantial evidence.  It is true that "a disability analyst is not considered to be an acceptable medical source under the Regulations."  Hopper v. Comm'r of Soc. Sec., No. 06-CV-38 (LEK/DRH), 2008 WL 724228, at *10 (N.D.N.Y. Mar, 17, 2008).  However, "it is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence and the report of a consultative physician may constitute such evidence."  Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (citations omitted).  Dr. Peets' examination specifically states, and is supported by substantial evidence in the record, that Barkley's gait and range of motion were normal. However, Barkley was limited to lifting and carrying ten pounds had no manual dexterity limitations, Dr. Peets stated a vague and unsubstantiated conclusion that Barkley's "[s]tanding, walking and sitting are limited as noted" and made no comment on her non-exertional limitations.  T. 136-37.

Such vague statements by the consultative physician leaves a gap in the record as to Barkley's exertional limitations while sitting[8] and non-exertional limitations for climbing, crawling, and stooping.  This gap assumes greater significance where, as here, the ALJ has denied controlling weight to the opinion of the claimant's treating source.  "[G]iven the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, the ALJ had an affirmative duty . . .  to develop the medical record if it was

_____

[8] Although the treating physician's opinion has been granted little controlling weight, it is also worth noting the Dr. Chicetti did not specify what Barkley's exertional limitations were while sitting either.  T. 170.  Thus, the treating physician's opinion, controverted or otherwise, left an identical gap in the record.

incomplete . . . , re-contact[ing] medical sources if the evidence . . . was inadequate . . .
and additional information was needed to reach a determination. " Hopper, 2008 WL
724228, at *11.

Accordingly, it is recommended that the Commissioner's determination here be
remanded for further proceedings.


### C.  Subjective Complaints of Pain

Barkley contends that the ALJ's decision to discredit her subjective complaints of
pain was in error. The Commissioner contends that the ALJ properly considered
Anderson's symptoms.

The ALJ determines whether an ailment is an impairment based on a two-part test.
First, the ALJ must decide, based upon objective medical evidence, whether "there [are]
medical signs and laboratory findings which show . . . medical impairment(s) which could
reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r of Soc. Sec.,
358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).  This primary
evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529 (2003).
"'Second, if the medical evidence alone establishes the existence of such impairments,
then the ALJ need only evaluate the intensity, persistence, and limiting effects of a
claimant's symptoms to determine the extent to which it limits the claimant's capacity to
work.'" Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin.,
No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these
symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529

17

(2003).  "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings."  Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983) (citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability requires more than mere inability to work without pain."  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Pain is a subjective concept  "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings."  Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence.  Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment.  See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

(I)  [The claimant's] daily activities;

(ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . .

18

pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Barkley's subjective complaints of the severity of her low back pain were not substantiated by the objective medical evidence.  T. 17-18. Barkley was able to attend to her personal hygiene, assist with meal preparation, house cleaning, and dishes, drives a car, occasionally go shopping, and had a bedroom, which she continued to use, on the second floor of the house.  T. 193, 211.  Additionally, Barkley sat and stood for an appreciable amount of time during the day.  T. 212-13.  Barkley also stated, on numerous occasions, that she discontinued working due to an inhospitable environment, was actively seeking employment, and would continue babysitting her cousin's two school-age children if the opportunity arose.  T. 130, 133, 214.

Moreover, Barkley was only taking Tylenol to relieve her pain.  T. 205.  In 2004, Barkley was prescribed pain medication, but when the prescription ran out, she decided not to refill it because she felt better and the over-the-counter medication had since adequately alleviated her pain.  Id.  Her lessened degree of pain, as well as her improvement in leg numbness, was corroborated and documented by Drs. Sugarman and Zirn.  T. 128, 130, 133.  Despite the improvements from the chiropractic treatments,

19

Barkley's back pain was recognized by all medical professionals she had seen, However,

both Dr. Chicetti and the disability analyst found that the resulting sitting and standing

limitations could be accommodated by changing positions.  T. 139, 170.  This appears

consistent with Barkley's own testimony about her ability to sit and stand for multiple hours

in the day and inconsistent with her prior report to the disability analyst that she could not

stand and walk for more than fifteen minutes at a time.  T. 212-13.  Based upon the

foregoing, there is substantial evidence to support the ALJ's conclusion that Barkley's

subjective complaints of pain were not at a disabling level.

        Therefore, it is recommended that the Commissioner's determination on this ground

be affirmed.


                                    **D. RFC**[9]

        Barkley contends that substantial evidence does not support the ALJ's findings

regarding her RFC.

        RFC describes what a claimant is capable of doing despite his or her impairments

considering all relevant evidence, which consists of physical limitations, symptoms, and

other limitations which go beyond the symptoms.  <u>Martone v. Apfel</u>, 70 F. Supp. 2d

145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC,

---

        [9] Barkley asserts that the Commissioner failed to account for her obesity when
determining her RFC.  However, all the treating physicians that saw Barkley noted her
obesity.  T. 129, 131, 134, 136, 161-68.  Additionally, the ALJ classified her obesity as a
severe condition.  T.19.  Therefore, the record indicates that Barkley's obesity was
properly factored into her RFC assessment and, although it may have been an
aggravating factor for her physical ailments, her obesity was not considered a limiting
factor for her ability to perform sedentary work.

                                         20

the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

The Grids do not provide the exclusive framework for making a disability determination if a claimant suffers from non-exertional impairments that "significantly limit the range of work permitted by exertional limitations." Id. at 39 (quoting Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986) (citation omitted)). Rather, the ALJ should elicit testimony from a vocational expert to determine if jobs exist in the economy that the claimant can still perform. Bapp, 802 F.2d at 604-05. Work capacity is "significantly diminished" if there is a loss of work capacity that narrows the possible range of work available and deprives the claimant of a meaningful employment opportunity. Id. at 605. Non-exertional impairments include "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. § 404.1569a(c)(1)(vi) (2003). The applicability of the grids should be considered on a case-by-case basis. Bapp, 802 F.2d at 605. However, the "mere existence of a non-exertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." Id. at 603.

Here, the ALJ concluded that Barkley's impairments did not allow her to perform her past work as a babysitter, cook, cashier, nurse's aide trainee, or grocery store clerk, although she could still perform work at the sedentary level. T. 19. Sedentary work is defined as

21

> lifting no more than 10 pounds at a time and occasionally lifting or carrying
> articles like docket files, ledgers, and small tools. Although a sedentary job
> is defined as one which involves sitting, a certain amount of walking and
> standing is often necessary in carrying out job duties. Jobs are sedentary
> if walking and standing are required occasionally and other sedentary
> criteria are met.

20 C.F.R. § 416.967(a); see also Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004)

("The regulations do not mandate the presumption that all sedentary jobs in the United

States require the worker to sit without moving for six hours, trapped like a seat-belted

passenger in the center seat on a transcontinental flight.").

The ALJ determined that Barkley could only lift and carry ten pounds and was

limited in her ability to stand, walk, and sit.  T. 17.  Additionally, both Dr. Chicetti and the

disability analyst concluded that Barkley's pain could be alleviated by alternating sitting

and standing.  T. 139, 170.  Despite the concurrence between the treating physician,

disability analyst, and record as a whole, "[t]he RFC assessment must be specific as to the

frequency of the individual's need to alternate sitting and standing [and i]t may be

especially useful . . .  to consult a vocational resource in order to determine whether the

individual is able to make an adjustment to [sedentary] work."  S.S.R. 96-9p.

Furthermore, Barkley was also subject to non-exertional impairments including the

uncontested inability to climb and occasional ability to kneel and crouch.  T. 140, 170.

Barkley contends that Dr. Chicetti's assessment that she was completely unable to climb,

balance, crawl, and, specifically, stoop significantly eroded her sedentary occupational

base.  Docket No. 6 at 17; S.S.R. 96-9p.  However, the treating physician's opinion was

correctly given little weight and the ALJ based his findings on the disability analyst's

findings concluding that Barkley was only occasionally limited in her ability to stoop, which

only minimally eroded her occupational base.  S.S.R. 96-6p; see also Ruiz v. Astrue, No. 06-CV-5362 (DC), 2007 WL 2660069 at *8 (S.D.N.Y. Sept. 12, 2007).

However, the disability analyst is not considered an acceptable medical source under the Regulations and Dr. Peets, the other physician on whom the ALJ relied, did not comment on the non-exertional limitations from which Barkley was suffering.  See 20 C.F.R. § 404.1513(a).  The ALJ was unable to rely solely on the disability analyst and the non-exertional limitations of Barkley being unable to climb and, at best, occasionally balance, crawl, kneel, crouch, and stoop were undisputed.  Thus, without this testimony, it appears that Barkley "retained the residual functional capacity to perform something less than the full range of sedentary work [and a]s such, the ALJ incorrectly relied on the Grid Rules to find that [she] was not disabled."  Orr v. Barnhart, 375 F. Supp. 2d 193, 200 (W.D.N.Y. 2005) (citing Bapp, 802 F.2d at 605).

The ALJ's failure to determine the RFC properly would affect findings made at the fifth step of the sequential analysis.  The ALJ solely utilized the Grids to determine that Barkley was not disabled.  However, the Grids cannot be the sole determinant of disability if a claimant suffered from non-exertional impairments that "significantly limit the range of work permitted by exertional limitations."  Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996). Because the ALJ failed to make such a determination, it is unclear whether the use of the Grids would have been appropriate or whether the ALJ should have employed a vocational expert to testify.

Accordingly, it is recommended that the Commissioner's determination here be remanded for further proceedings.

23

## VI.  Remand or Reversal

A reviewing court has the authority to reverse with or without remand. 42 U.S.C. §§ 405(g), 1383(c)(3) (2003).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  Curry, 209 F.3d at 124.  Reversal is appropriate, however, where there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  Id.; see also Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  Here, further development of the record is required both as to the medical record and Barkley's RFC.  Accordingly, it is recommended that the decision of the Commissioner be remanded for further proceedings rather than reversed.

## VI. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the decision denying disability benefits be **REMANDED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED: May 13, 2008
       Albany, New York

_David R. Homer_

United States Magistrate Judge

24